

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---

| | | |
|---|---|---|
| GEORGE J. BAGHDADY, | X | |
| Plaintiff(s) | | Civil Action No. |
| | X | |
| -vs- | | 3:97CV01188 (AVC) |
| SAMI J. BAGHDADY and | X | SEPTEMBER 22, 1999 |
| SAMI W. EL TEENY, | | |
| Defendant(s) | X | |

---

DEPOSITION OF SAMI J. BAGHDADY

Session II

Pretrial deposition taken in the above-entitled action on behalf of the plaintiff, before John J. Carreiro, a Notary Public and Shorthand Reporter, Lic. #169, pursuant to the Federal Rules of Civil Procedure, at 12 p.m., at the Law Offices of Halloran & Sage, LLP, One Goodwin Square, 225 Asylum Street, Hartford, Connecticut 06103.

JOHN J. CARREIRO, RPR - (203)452-1148

1

2    A P P E A R A N C E S:

3

4

5        Representing the Plaintiff(s)

6            MARIA S. SPALDING, ESQ.
             UPDIKE, KELLY & SPELLACY, P.C.
7            Century Tower
             265 Church Street
8            New Haven, Connecticut 06510

9

10       Representing the Defendant(s)

11           JOSEPH G. FORTNER, JR., ESQ.
             HALLORAN & SAGE, LLP
12           One Goodwin Square
             225 Asylum Street
13           Hartford, Connecticut 06103

14

15       Also Present

16           David Baghdady, Esq.
             Sami S. Baghdady, Esq.
17

18

19                        _____

20

21

22

23

24

25

1

2          <u>STIPULATIONS AS TO TAKING OF DEPOSITION</u>

3

4          IT IS HEREBY STIPULATED AND AGREED by and

5    between counsel representing the respective parties

6    that each party reserves the right to make specific

7    objections at the trial to each and every question

8    asked and of the answers given thereto by the

9    deponent, reserving the right to move to strike out

10   where applicable, except as to such objections as are

11   directed to the form of the question.

12         IT IS FURTHER STIPULATED AND AGREED by and

13   between counsel representing the respective parties

14   that proof of the authority of the Notary Public

15   before whom this deposition is taken is waived.

16         IT IS FURTHER STIPULATED AND AGREED by and

17   between counsel representing the respective parties

18   that the reading and signing of the deposition by the

19   deponent is reserved.

20         IT IS FURTHER STIPULATED AND AGREED by and

21   between counsel representing the respective parties

22   that all defects, if any, as to the notice of the

23   taking of the deposition are waived.

24         Filing of the Notice of Deposition with the

25   original transcript is waived.

1

2          S A M I   J.   B A G H D A D Y, the witness,

3    after having been re-sworn, by John J. Carreiro, a

4    Notary Public, testified under oath as follows:

5    CONTINUED DIRECT EXAMINATION

6    BY MS. SPALDING:

7        Q     Good afternoon, Mr. Baghdady.  We are here

8    today to continue and finish your deposition.  I

9    don't think I'm going to keep you very long.  As you

10   sit here today, are you on any medications?

11       A     No, ma'am.

12       Q     Before you came to your deposition today,

13   did you review the transcript of your prior

14   testimony?

15       A     No, ma'am.

16       Q     Did you review any of the transcripts in

17   this case before you came here today?

18       A     No.

19       Q     Did you have any discussions with anyone who

20   is not your lawyer about your testimony for today?

21       A     No, ma'am.

22       Q     Mr. Baghdady, have you completed doctoral

23   studies of any kind?

24       A     Did I what, please?

25       Q     Have you completed doctoral studies?

S. BAGHDADY - DIRECT - SPALDING

1

2          MR. FORTNER:  Objection.  Relevance.

3          You may answer.

4     A    No.  I took some courses.

5     Q    So you don't have a doctorate?

6     A    No, no.

7     Q    And you are not a recipient of any honorary

8  doctoral degree?

9     A    No, I'm not.

10         MR. FORTNER:  Objection.  Relevance.

11         I'll allow only a few more questions in this

12         area.  This is totally irrelevant.

13    Q    Mr. Baghdady, in what year did you enter

14  into negotiations with your brother, George, for the

15  sale of the 800 shares of the building?

16    A    1971.

17    Q    Do you remember about what time of year that

18  was?

19    A    It was prior to early July during '71, but

20  probably a few days before the issuance of the check

21  and the granting of the store.

22    Q    And that is the check of July 30th, 1971

23  that you sent to your brother, correct?

24    A    Correct.

25    Q    And there is another check that you sent to

                    S. BAGHDADY - DIRECT - SPALDING

1

2    your brother with a letter of April 1st, 1978.  Do

3    you remember that?

4         A    Correct.  I do.

5         Q    There was a check that you had sent to your

6    brother on March 12, 1973?

7         A    Correct.

8         Q    Did you send any letter with that check to

9    your brother?

10        A    I did.

11        Q    Do you have a copy of that letter?

12        A    Not on me, I don't, but my attorney had it.

13        Q    Of 3/12/73?

14        A    June?

15             MR. FORTNER:  March 12, 1973.  This is

16             news to me.

17        A    Excuse me.  Yes, that was '73, that letter.

18             MR. FORTNER:  March 12th?  She is

19             asking a specific date.

20        A    They have the two letters there.  March

21    12th.

22             MR. FORTNER:  Sami, I don't want you to

23             guess here.  She is aware of the two letters

24             and checks that we produced.  She is now

25             asking about something independent of that.

S. BAGHDADY - DIRECT - SPALDING

2          There was a '71 letter that was produced and

3          check, and there is a '78 letter and check.

4     A     Excuse me.  There was a '78, nothing in

5 '73.

6     Q     Okay.  So there was no letter --

7     A     Excuse me.  A check was issued in '73.

8     Q     And why did you not send a letter with that

9 check the way you did with the others?

10     A     Because we parted there on the understanding

11 that he will inform and let his attorney, Ray Ganim,

12 write a quitclaim deed for Stratford, and that final

13 payment of the last $10,000 and the quitclaim deed

14 will constitute the finalization.

15     Q     Okay.  But you didn't write any letter with

16 that check, the check that was dated March 12, 1973?

17     A     Correct.

18     Q     And it is your testimony that in 1973 you

19 came to an agreement that George was going to contact

20 Attorney Ganim about the quitclaim deed and the final

21 payment?

22     A     Excuse me.  Repeat that question.

23          MS. SPALDING:  Can you read that back.

24          (The pending question was read by the

25          reporter.)

S. BAGHDADY - DIRECT - SPALDING

2    A    Final payment of what?

3    Q    The final payment --

4         MR. FORTNER:  If you don't understand

5         the question, ask her to rephrase it.

6         THE WITNESS:  Is that a complete

7         question at the end?

8         MS. SPALDING:  Read the prior question

9         to refresh my recollection.

10        (The following testimony was read by

11        the reporter:)

12        "QUESTION:  Okay.  But you didn't write

13        any letter with that check, the check that

14        was dated March 12, 1973?

15        "ANSWER:  Correct.

16        "QUESTION:  And it is your testimony

17        that in 1973 you came to an agreement that

18        George was going to contact Attorney Ganim

19        about the quitclaim deed and the final

20        payment?"

21   A    About the preparation of the quitclaim deed.

22   Q    And this was an oral agreement?

23   A    Correct.

24   Q    And that was not reduced to writing

25   anywhere?

151

S. BAGHDADY - DIRECT - SPALDING

1

2      A      No.  Only the two letters that are cited.

3      Q      And when did you understand that you were

4  going to get the quitclaim deed and the final

5  payment?

6      A      As soon as Ray Ganim prepares the deed I am

7  to be contacted and we will finalize the whole thing

8  at that time.

9      Q      And were you contacted?

10     A      I was not contacted until around the 8th of

11  April.

12     Q      Of 1978?

13     A      With the quitclaim deed, correct.

14     Q      But you had received a check, dated April 1,

15  1978?

16              MR. FORTNER:  Objection to the form.  I

17              don't think he testified he received a

18              check.

19     A      I did not receive any checks.  I issued a

20  check.

21     Q      That's what I mean.  You issued a check,

22  dated April 1, 1978?

23     A      Correct.

24     Q      Did you have any direct contact with

25  Mr. Ganim about the quitclaim deed?

S. BAGHDADY - DIRECT - SPALDING

1

2    A    No, I did not.

3    Q    Now, I just want you to tell me once more --

4              MR. FORTNER:  No, we are not going to

5         have the same question asked.

6              MS. SPALDING:  Yes, we are.

7              MR. FORTNER:  No, we're not.

8    Q    What was the consideration that you paid

9    over to George for the transfer of the shares?  I

10   want to make sure I've got it right.

11             MR. FORTNER:  Objection.

12   Q    The quitclaim deed --

13             MR. FORTNER:  You already said you're

14        asking it once again.  It was asked and

15        answered.  He is not going to be asked and

16        answer it again.  If you have other

17        questions, Counsel, that you would like to

18        ask, feel free to do so.

19             MS. SPALDING:  Then he'll have to

20        explain why he has given four different

21        answers in his interrogatory responses at

22        the time of trial.  I'm just giving the

23        witness a chance to explain something.  You

24        don't want him to explain it, he'll have to

25        explain it to the Court.

                    S. BAGHDADY - DIRECT - SPALDING

1

2              MR. FORTNER:  I'm going to object to

3          the --

4              MS. SPALDING:  Now --

5              MR. FORTNER:  -- characterization.

6          Counsel, let me make my statement.  I will

7          object to the characterization of his

8          testimony.  If you have specific questions

9          that you want to ask him about his

10         interrogatory responses, you can feel free

11         to do that.  In any event, you ask him fresh

12         questions.  That's fine.  You can ask

13         follow-ups.  You know that.

14    Q    How was the value established in 1971 of

15   what you were going to pay for consideration of the

16   800 shares?

17    A    It was through a rent roll that George had

18   presented to me.

19    Q    So this was based on a rent roll?

20    A    On a rent roll, plus further inquiries by

21   him to determine the exact amount for the transfer.

22    Q    Was the amount of $350,000 ever established,

23   ever discussed?

24    A    Never.

25    Q    And the transfer was recorded in 1977,

S. BAGHDADY - DIRECT - SPALDING

2    correct?

3    A    Correct.

4            MR. FORTNER:  Objection to the form.

5        Transfer of what?

6    Q    The transfer of the shares in the property

7    in Zahleh, correct?

8    A    Correct.

9    Q    Did you write to George to tell him that the

10   transfer had taken place?

11   A    He knew it before me.

12   Q    And how did he know it before you?

13   A    It would assume through his agent.

14   Q    Who was Sami El Teeny?

15   A    Sami El Teeny, correct.

16   Q    Did you tell him about it yourself?

17           MR. FORTNER:  Objection to the form.

18       When?

19           MS. SPALDING:  At the time that the

20           property was transferred.

21   A    No, I did not.  I know he contacted me first

22   on that.

23   Q    Now, it is your position that you never

24   borrowed money from George at any time or for any

25   purpose, correct?

S. BAGHDADY - DIRECT - SPALDING

1

2     A     Never.  George had no money to lend to

3  anyone.

4     Q     Was George ever given the option to buy your

5  800 shares in the Zahleh property?

6     A     He was by his mother and by me, correct.

7     Q     And that was in 1974?

8     A     In the '70s, the early '70s.  I don't recall

9  exactly.

10    Q     All right.  Why did it take from 1971 until

11  1978 to complete this deal?

12    A     It was largely because of his performance

13  throughout.  In 1971, when I agreed to buy from him

14  and he offered me the shares he was to re-establish

15  to see exactly how much he would want for the shares,

16  and that went right through 1973.  And then after

17  that, after that was established based on contacts

18  that he had made, then the other issue was for him to

19  contact the attorney and go through the rest of the

20  completion of what we agreed on specifically, the

21  last payment, which included the $10,000 of April 1,

22  1978 and the half property in Stratford,

23  Connecticut.  Time dragged on, and there were years

24  of war so, therefore, a delay took place.  I was

25  busy, he was busy, and the issue was not pushed until

S. BAGHDADY - DIRECT - SPALDING

1    1977.

3    Q    Do you own any part of the garden business,

4    his garden business?

5    A    When?

6    Q    Now.

7    A    Yes, I do.

8    Q    How much do you claim that you own of his

9    garden business?

10    A    I have not determined yet.

11    Q    Do you claim that George owes you money?

12    A    Yes, he does.

13    Q    How much money do you claim George owes you?

14    A    I still have not determined.

15    Q    And you deny that you owe him any money,

16    correct?

17    A    Correct.

18    Q    At the time that you allege that George

19    appointed Sami El Teeny as his attorney in fact, did

20    you have any discussions with George about that?

21                MR. FORTNER:  Objection to the form.

22                If you understand it, you may answer.

23    A    About what specifically?  I don't

24    understand.

25    Q    About Sami El Teeny acting for him.

S. BAGHDADY - DIRECT - SPALDING

1

2          MR. FORTNER:  I'm still going to object

3          to the form of that question.  I still don't

4          understand it.  You can answer it, if you

5          understand it.

6     A    It was a stated fact given to me by him in

7 front of the Consulate in New York.

8     Q    On or about that time, isn't it true that

9 Sami El Teeny was acting as your attorney in fact in

10 Lebanon, correct?

11    A    On what issues?

12    Q    On other issues having to do with other

13 transfers of property.

14    A    Other transfers of property?  What

15 properties are we talking about?

16    Q    Sir, do you recognize this document?

17    A    Yes.  That is a power of attorney given by

18 Elie to his mother.

19    Q    And at the bottom of it doesn't it say that

20 you delivered by hand to Mr. Sami El Teeny per his

21 delegation?

22    A    Excuse me.  Elie never signed this

23 document.  It's an incomplete document.

24    Q    Did you ever sign that document?

25    A    I did?  It's not me.  It's given by Elie to

S. BAGHDADY - DIRECT - SPALDING

1    

2    his mother, and he did not sign it.

3        Q    Did Sami El Teeny ever act for you as a

4    power of attorney or as an attorney in fact?

5        A    Act for me?

6        Q    Yes.

7        A    What period?

8        Q    At any time from 1971 until the present.

9        A    To the present?  After '77, yes.

10       Q    And that was through the management of the

11   building?

12       A    Correct.

13       Q    Mr. Baghdady, when this deal was in its

14   negotiation phase, did you take steps to find out

15   what you had to do in Lebanon to transfer property

16   among citizens --

17            MR. FORTNER:  Objection.

18       Q    -- or people who were not living in Lebanon?

19            MR. FORTNER:  Objection.  You may

20            answer.

21       A    No, I did not.

22       Q    Did you hire somebody to do it for you?

23       A    No, I did not.

24       Q    Then how did you go about doing it?

25       A    Through George.  He contacted the Counsulate

S. BAGHDADY - DIRECT - SPALDING

1  in New York and made an appointment for us to go to

2  the Consulate to find out what was needed to go

3  through the transfer.

4      Q    And were you advised by anyone as to the

5  transfer?  Did you retain counsel?

6      A    No, I did not.

7      Q    The last time that we were together,

8  Mr. Baghdady, I asked you if you had any knowledge

9  about lot 247.  Do you remember me asking you that?

10     A    Correct.

11     Q    Is lot 247 part of the property on which the

12 building that is in question in this case sits on?

13              MR. FORTNER:  Objection to form.  Vague

14              and ambiguous.  You may answer.

15     A    No, ma'am.

16     Q    Now, it is my client's position that he

17 still owns half of that property.  247 is the lot

18 where you are building now?

19     A    No.

20     Q    Is that wrong?

21     A    Wrong.

22     Q    Is the property that you are building on now

23 near the property that is the subject of this suit?

24     A    There is a road between both properties,

S. BAGHDADY - DIRECT - SPALDING

1

2    correct, a public road.

3        Q    And it is your testimony that George has no

4    claim to that property?

5        A    Absolutely not.

6            MR. FORTNER:  It is also totally

7            irrelevant to this case.  I'm letting him

8            answer to get this done.

9        A    Absolutely not.  The records so indicate,

10   public records.

11       Q    Now, Mr. Baghdady, we checked with the

12   University of Bridgeport's Department of Engineering

13   and were told that you did not, in fact, start their

14   Department of Engineering.  You know, this is an

15   opportunity for you to correct some incorrect

16   testimony.

17           MR. FORTNER:  Fine.  I'm looking at the

18           university sitting over here.  You can make

19           whatever speeches you want.  You can say

20           whatever hearsay you want.  The witness's

21           testimony is the witness's testimony.  He's

22           not going to answer these questions.

23           MS. SPALDING:  Okay.

24           MR. FORTNER:  By the way, his

25           opportunity to correct his transcript and

S. BAGHDADY - DIRECT - SPALDING

2      his opportunity to make those kinds of

3      corrections has to do with the errata

4      sheet.  Remember that part?

5           MS. SPALDING:  I think you and I have a

6      different understanding of what the errata

7      sheet is for.

8           MR. FORTNER:  I know what the errata

9      sheet is for.  If you have something you are

10     going to impeach my client with, that's your

11     prerogative at trial, if we ever get to it.

12  Q      Did you tell me you were hospitalized as a

13  result of an accident in the late '50s?

14           MR. FORTNER:  Objection.  I instruct

15     the witness not to answer.  If you have

16     testimony from a deposition you want to

17     point to, that's fine.

18           MS. SPALDING:  You know, I think I

19     should note for the record that the

20     atmosphere today is extremely hostile.

21           MR. FORTNER:  Yes, coming from your

22     side of the table.  It has been coming with

23     daggers from the beginning.  From the

24     get-go, it has been attack, attack, attack.

25           MS. SPALDING:  Well, you're the one who

S. BAGHDADY - DIRECT - SPALDING

1

2    is instructing your client not to answer

3    questions.

4            MR. FORTNER:  Once.

5            MS. SPALDING:  Well, once might just be

6    enough.

7            MR. FORTNER:  I don't think so when

8    it's totally irrelevant.

9            MS. SPALDING:  I'm just going to stand

10   with his prior testimony.  I'm not going to

11   take the time.

12   Q    Now, Mr. Baghdady, the last time when we

13   were together we talked a little bit about some of

14   the compensation that you pay to Mrs. Cooper, that

15   part of her compensation is housing.  My question for

16   you is do you report that on your income taxes?

17   A    What, please?

18   Q    Do you report that on your income taxes?

19           MR. FORTNER:  How is that relevant?

20   How is it possibly relevant?

21           MS. SPALDING:  If he is defrauding the

22   government --

23           You can laugh all you want, but if he's

24   defrauding the government, that goes to his

25   credibility.

S. BAGHDADY - DIRECT - SPALDING

1    MR. FORTNER:  First of all, I don't

2    believe you can just sit here and ask about

3    somebody's personal financial affairs by

4    just making a blanket statement without the

5    slightest bit of support that he is

6    defrauding the government.  That's, frankly,

7    close to defamatory.  No, it's past

8    defamatory if we weren't in a legal

9    proceeding.

10    MS. SPALDING:  We are in a legal

11    proceeding --

12    MR. FORTNER:  I understand that.

13    MS. SPALDING:  -- and that's why I'm

14    able to ask it.

15    MR. FORTNER:  Now, he has not waived

16    his right to financial privacy.  He has not

17    waived a right to privacy for his tax

18    returns.  You and I both know that there is

19    a privacy interest implicated.   And unless

20    you have a foundation for demonstrating

21    there is information on his tax returns that

22    is germane to this case that you ought to be

23    able to have, I don't think that's

24    appropriate.

164

S. BAGHDADY - DIRECT - SPALDING

1

2    Q    Did you tell George in May of 1977 that you

3    already had a power of attorney delegating Sami El

4    Teeny as your attorney in fact on another matter

5    within the same time frame?

6    A    I don't recall.

7    Q    You don't recall.

8    Q    Is it possible --

9        MR. FORTNER:  Objection to the form.

10    Q    -- that Sami El Teeny was acting as your

11    agent on or about the pertinent dates of 1977 when

12    this matter was registered in Zahleh?

13        MR. FORTNER:  Objection to the form.

14        MS. SPALDING:  It a fair question.

15        MR. FORTNER:  I think where it may be

16        trying to go may be an an appropriate

17        question, but I think it's objectionable

18        because (a) it asks for speculation; (b) I

19        think it's vague.

20        MS. SPALDING:  I'm asking a fact.

21        MR. FORTNER:  You said, "Is it

22        possible..."  If you want to ask facts,

23        that's fine.

24        The other reason for my objection to

25        the form is I think it's vague and

S. BAGHDADY - DIRECT - SPALDING

1

2          ambiguous.  I'm not going to direct him not

3          to answer.  I'm just making my objection for

4          the record.

5     A    He was not.

6     Q    He was not acting as your attorney in fact

7  during that period of time?

8     A    With respect to what?

9          MR. FORTNER:  Objection to the form.

10    Q    With respect to any other matter?

11    A    Not to my knowledge.

12         MS. SPALDING:  I have, I think, no more

13         questions.

14         MR. FORTNER:  Okay.

15         MS. SPALDING:  Let me just check my

16         notes.

17         MS. SPALDING:  That's it.

18         (Whereupon, the deposition was

19         concluded.)

20

21

22

23

24

25

## CERTIFICATION

STATE OF CONNECTICUT    )
                        )    ss.    Trumbull
DISTRICT OF FAIRFIELD   )


I, John J. Carreiro, a Notary Public, duly commissioned and qualified in and for the District of Fairfield, State of Connecticut, do hereby certify that, pursuant to notice and in accordance with the stipulations set forth, there came before me on the 22nd day of September 1999, at the offices of Halloran & Sage, LLP, One Goodwin Square, 225 Asylum Street, Hartford, Connecticut, the following named person, to wit: Sami J. Baghdady, the witness, who was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this action, that he was thereupon carefully examined upon his oath and his examination reduced to typewriting by me, that the deposition is a true and accurate record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the outcome of said action.

In witness whereof I have hereunto set my hand and affixed my notarial seal this 24th day of September 1999.

(My commission expires April 2003.)


*John J. Carreiro*
_____
John J. Carreiro, Notary Public
Shorthand Reporter - Lic. #169


JOHN J. CARREIRO, RPR - (203)452-1148

# EXHIBIT 2

{}

July 30, 1971

Dear George:

As you requested this letter is to confirm that as of January 1, 1971 you are the sole owner of the Mary Carter Paint Store located at 2225 Barnum Avenue in Stratford, Connecticut

The enclosed check for Five Thousand dollars and my conveyance of the paint store to you, constitute part of the consideration for your 1/3 interest in the property identified as lot # 246 in Zahleh, Lebanon.

Very Truly Yours

Danni

P.S.

George as we discussed my retained earnings prior to 1/1/71 from the paint store shall be applied as part of my capitalization in the Garden Center business.